**RECORD NOS. 09-3028(L), 09-3045 XAP**

**ORAL ARGUMENT SCHEDULED**

In The

# United States Court of Appeals

For The Tenth Circuit

## UNITED STATES OF AMERICA,

*Plaintiff – Appellant/Cros -Appellee*,

v.

## STEPHEN J. SCHNEIDER;
## LINDA K. SCHNEIDER, a/k/a Linda K. Atterbury,
## d/b/a Schneider Medical Clinic,

*Defendants – Appellees/Cross-Appellants.*

### ON APPEAL FROM THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF KANSAS
### AT WICHITA
### CASE NO. 6:07-CR-10234-MLB-1
### Honorable Monti L. Belot

———————

## BRIEF OF APPELLEES/CROSS–APPELLANTS

———————

Eugene V. Gorokhov
EUGENE V. GOROKHOV, PLLC
1800 Wilson Boulevard, Suite 12
Arlington, Virginia 22201
(703) 310-7587
Eugene@evgpllc.com

*Counsel for Appellees/*
*Cross-Appellants*

Kevin P. Byers
KEVIN P. BYERS COMPLANY, L.P.A.
107 South High Street, Suite 400
Columbus, Ohio 43215
(614) 228-6283
kevin@kpbyerslaw.com

*Counsel for Appellees/*
*Cross-Appellants*

Lawrence W. Williamson, Jr
WILLIAMSON LAW FIRM, PLLC
1816 Ann Avenue
Kansas City, Missouri 66101
(913) 871-7060
l.Williamson@williamsonfirm.com

*Counsel for Appellees/*
*Cross-Appellants*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................ iv

RELATED APPEALS .................................................................................. xii

INTRODUCTION ........................................................................................ 1

STATEMENT OF JURISDICTION ............................................................ 2

ISSUES PRESENTED FOR REVIEW ....................................................... 3

STATEMENT OF THE CASE .................................................................... 3

STATEMENT OF THE FACTS .................................................................. 4

      1.    The Indictment ............................................................... 4

      2.    The Motions to Exclude the Government's Proposed Expert Testimony Under Fed. R. Evid. 702, and Related Matters ........................................................................... 6

      3.  The Motion *in Limine* and Ruling ................................. 7

SUMMARY OF THE ARGUMENT ........................................................... 8

ARGUMENT ............................................................................................... 11

      I.     THE GOVERNMENT'S APPEAL HAS NO MERIT ............ 11

           A.   Standard of Review ........................................................ 11

           B.   The District Court Properly Excluded Evidence of 17 Patient Deaths ........................................................... 11

                1.    The District Court Properly Exercised its Discretion to Exclude Confusing and Time-Consuming Evidence ........................................... 12

i

2.  Other Legal Grounds Support the District Court's Decision ................................................. 21

    a.  The Evidence Excluded Was Not Relevant and Should Have Been Excluded Pursuant to Fed. R. Evid. 104(b) ...................................................... 21

    b.  The Evidence Excluded Was Unfairly Prejudicial ................................................. 27

    c.  The Limitation of Count 5 to One Patient was Necessary Because the Excised Deaths Were Duplicitous............. 29

C.  The District Court's Decision to Limit the Length of Trial ........................................................................ 34

II.  THE DISTRICT COURT SHOULD HAVE EXCLUDED ALL OF THE GOVERNMENT'S PROPOSED TESTIMONY REGARDING CAUSE OF DEATH ................................................................... 37

A.  Standard of Review ........................................................ 37

B.  Applicable Law ............................................................. 38

C.  The Government Failed to Meet Its Burden Under Fed. R. Evid. 702, and its proposed expert testimony should have been excluded ........................... 40

    1.  Background .......................................................... 40

    2.  Argument ............................................................ 44

D.  The Government's Proposed Expert Testimony Is Inadmissible Under Fed. R. Evid. 702............................ 47

    1.  The Lack of Methodology to Rule Out Alternative Causes of Death ................................ 47

2.     The Lack of Reliability of Post-Mortem Toxicology Findings............................................ 49

3.     Other Unreliable Procedures and Results............ 51

4.     The Lack of Reliable Methodology with Respect to Conclusions Based on Patient Behaviors and Prescribing Practices ................... 53

CONCLUSION............................................................................. 58

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Anthony v. BTR Auto. Sealing Sys.*,
339 F.3d 506 (6th Cir. 2003) .............................................................. 34

*Bitler v. A.O. Smith Corp.*,
400 F.3d 1227 (10th Cir. 2004) .......................................................... 56

*Blockburger v. United States*,
284 U.S. 299 (1932) ........................................................................... 30

*Borges v. Our Lady of Sea Corp.*,
935 F.2d 436 (1st Cir. 1991) .............................................................. 34

*C.A. Associates v. Dow Chemical Co.*,
918 F.2d 1485 (10th Cir. 1990) .................................................... 15, 19

*Dandridge v. Williams*,
397 U.S. 471 (1970) ........................................................................... 21

*Daubert v. Merrell Dow Pharmaceuticals*,
509 U.S. 579 (1993) ................................................................... *passim*

*Dodge v. Cotter Corp.*,
328 F.3d 1212 (10th Cir. 2003) .................................................... 38, 44

*Duquesne Light Co. v. Westinghouse Elec. Corp.*,
66 F.3d 604 (3d Cir. 1995) ................................................................. 35

*Fed. Deposit Ins. Corp. v. Clark*,
768 F. Supp. 1402 (D. Colo. 1989), *aff'd*,
978 F.2d 1541 (10th Cir. 1992) .......................................................... 19

*Flaminio v. Honda Motor Co.*,
733 F.2d 463 (7th Cir. 1984) ........................................................ 34, 35

*Gonzalez v. Oregon*,
 546 U.S. 243 (2006) ................................................................ 5

*Harris v. Chand*,
 506 F.3d 1135 (8th Cir. 2007) .............................................. 11

*Hollander v. Sandoz Pharms*.,
 289 F.3d 1193 (10th Cir. 2002) ............................................ 48

*Huddleston v. United States*,
 485 U.S. 681 (1988) ................................................. 22, 23, 28

*Joseph v. Terminix Int'l Co.*,
 17 F.3d 1282 (10th Cir.1994) ............................................... 11

*Kumho Tire v. Carmichael*,
 526 U.S. 137 (1999) ...................................................... *passim*

*Macsenti v. Becker*,
 237 F.3d 1223 (10th Cir. 2001) ............................................ 46

*MCI Communications Corp. v. American Tel. & Tel. Co.*,
 708 F.2d 1081 (7th Cir. 1982) ....................................... 34, 25

*Melendez-Diaz v. Massachusetts*,
 No. 07-591 (U.S. argued Nov. 10, 2008) ............................. 20

*Ralston v. Smith & Nephew Richards, Inc.*,
 275 F.3d 965 (10th Cir. 2001) ....................................... 39, 44

*RoDa Drilling Co. v. Siegal*,
 552 F.3d 1203 (10th Cir. 2009) ............................................ 20

*S. Utah Wilderness Alliance v. Bureau Land Mgmt.*,
 425 F.3d 735 (10th Cir. 2005) .............................................. 21

*Thompson v. State Farm Fire and Cas. Co*.,
 34 F.3d 932 (10th Cir. 1994) ............................................... 27

*United States v. Alberti*,
    568 F2d 617 (2d Cir 1988) ................................................................. 14

*United States v. Allocco*,
    801 F. Supp. 1000 (E.D.N.Y. 1992)................................................... 23

*United States v. Beechum*,
    582 F.2d 898 (5th Cir. 1978)............................................................. 22

*United States v. Brown*,
    557 F.2d 541 (6th Cir. 1977)............................................................. 58

*United States v. Browning, Inc.*,
    572 F.2d 720 (10th Cir. 1978)..................................................... 30, 32

*United States v. Buchanan*,
    485 F.3d 274 (5th Cir. 2007)............................................................. 30

*United States v. Cardall*,
    885 F.2d 656 (10th Cir. 1989)........................................................... 26

*United States v. Cooper*,
    966 F.2d 936 (5th Cir. 1992)............................................................. 32

*United States v. Cote*,
    744 F.2d 913 (2d Cir. 1984)............................................................. 23

*United States v. Cummiskey*,
    728 F.2d 200 (3d Cir. 1984)............................................................. 23

*United States v. Dashney*,
    937 F.2d 532 (10th Cir.) *cert. denied*,
    502 U.S. 951, 112 S. Ct. 402, 116 L. Ed. 2d 351 (1991) ................... 29

*United States v. DeCologero*,
    364 F.3d 12 (1st Cir. 2004) ........................................................ 13, 14

*United States v. Giannattasio*,
    979 F.2d 98 (7th Cir. 1992)............................................................... 13

*United States v. Glover*,
　　846 F.2d 339 (6th Cir. 1988) ............................................................. 15

*United States v. Guardia*,
　　135 F.3d 1326 (10th Cir. 1998) ................................................... *passim*

*United States v. Haddock*,
　　956 F.2d 1534 (10th Cir.) *reh'g in part*,
　　961 F.2d 933 (10th Cir. 1992) ......................................................... 29

*United States v. Henry*,
　　504 F.2d 1335 (10th Cir. 1974) ....................................................... 14

*United States v. Hildebrand*,
　　928 F. Supp. 841 (N.D. Iowa 1996) ................................................. 36

*United States v. Hill*,
　　55 F.3d 1197 (6th Cir. 1995) ........................................................... 14

*United States v. Jaynes*,
　　75 F.3d 1493 (10th Cir. 1996) ................................................... 30, 32

*United States v. Jones*,
　　570 F.2d 765 (8th Cir. 1978) ........................................................... 20

*United States v. Kendall*,
　　766 F.2d 1426 (10th Cir. 1985) ....................................................... 26

*United States v. Lartey*,
　　716 F.2d 955 (2d Cir. 1983) ............................................................ 33

*United States v. Leon*,
　　966 F.2d 1455 (6th Cir. 1992) ......................................................... 58

*United States v. Martinez*,
　　938 F.2d 1078 (10th Cir. 1991) ....................................................... 27

*United States v. McManaman*,
　　606 F.2d 919 (10th Cir. 1979) ......................................................... 27

*United States v. McVeigh*,
    153 F.3d 1166 (10th Cir. 1998) ........................................................... 16

*United States v. Nacchio*,
    No. 07-1311 (10th Cir. filed Feb. 26, 2009)(en banc) ..... 40, 42, 45, 46

*United States v. Nakashian*,
    820 F2d 549, 550 (2d Cir 1987) ........................................................... 14

*United States v. Platero*,
    72 F.3d 806 (10th Cir. 1995) .............................................................. 23

*United States v. Quaintance*,
    523 F.3d 1144 (10th Cir. 2008) ............................................................. 2

*United States v. Reaves*,
    636 F. Supp. 1575 (E.D. Ky. 1986) .................................................... 36

*United States v. Ridlehuber*,
    11 F.3d 516 (5th Cir. 1993) .......................................................... 23, 28

*United States v. Rodriguez-Felix*,
    450 F.3d 1117 (10th Cir. 2006) ........................................................... 37

*United States v. Sasser*,
    971 F.2d 470 (10th Cir. 1992) ...................................................... 29, 31

*United States v. Shorter*,
    809 F.2d 54 (D.C. Cir. 1987) ....................................................... 31, 32

*United States v. Smith*,
    941 F. Supp. 985 (D. Kan. 1996) ....................................................... 33

*United States v. Sugar*,
    606 F. Supp. 1134 (S.D.N.Y. 1985) ................................................... 33

*United States v. Thompson*,
    624 F.2d 740 (5th Cir. 1980) .............................................................. 32

*United States v. Vest*,
    116 F.3d 1179 (7th Cir. 1997) ............................................................ 35

*United States v. Wiles*,
    102 F.3d 1043 (10th Cir. 1996) ......................................................... 29

*United States v. Zabaneh*,
    837 F.2d 1249 (5th Cir. 1988) ........................................................... 23

*United States v. Zabawa*,
    39 F.3d 279 (10th Cir. 1994) ........................................................ 2, 13

*United Steelworkers of America v. Oregon Steel Mills, Inc.*,
    322 F.3d 1222 (10th Cir. 2003) ......................................................... 34

*Wheeler v. John Deere Co.*,
    862 F.2d 1404 (10th Cir. 1988) ......................................................... 15

## STATUTES

18 U.S.C. § 2 ..................................................................................... 14

18 U.S.C. § 924(c)(1) .......................................................................... 33

18 U.S.C. § 1955 ................................................................................ 14

18 U.S.C. § 3731 ............................................................................ 2, 14

21 U.S.C. § 841 .................................................................................. 33

21 U.S.C. § 841(a)(1) ....................................................................... 4, 32

26 U.S.C. § 7201 ........................................................................... 31-32

## RULES

Fed. R. Crim. P. 7(d) .......................................................................... 14

Fed. R. Evid. 104(a) ................................................................ 10, 40, 44

Fed. R. Evid. 104(b)................................................................ *passim*

Fed. R. Evid. 401 ................................................................ 22

Fed. R. Evid. 402 ................................................................ 22

Fed. R. Evid. 403 ................................................................ *passim*

Fed. R. Evid. 404(b)............................................................ 20, 26

Fed. R. Evid. 413 ................................................................ 16

Fed. R. Evid. 702 ................................................................ *passim*

## OTHER AUTHORITIES

1A Charles Alan Wright & Kenneth W. Graham, Jr.,
*Federal Practice and Procedure* § 142 ........................................ 31

2 John Henry Wigmore,
*Evidence* § 44 (James H. Chadbourn rev., 1979) ......................... 16

21 Charles Alan Wright & Kenneth W. Graham, Jr.,
*Federal Practice and Procedure* § 5054 (1977) .......................... 22

23 Charles Alan Wright & Kenneth W. Graham, Jr.,
*Federal Practice and Procedure* § 5412 (Supp. 1997) ................ 17

Beth F. Jung & Marcus M. Reidenberg,
*Interpretation of Opioid Levels: Comparison of Levels from
Chronic Pain Therapy to Levels From Forensic Autopsies*,
77(4) Clinical Pharmacology & Therapeutics, volume 324-34 (2005)........ 50

Charles Chabal, et al., *Prescription Opiate Abuse in
Chronic Pain Patients: Clinical Criteria, Incidence, and Predictors*,
13 Clin. J. Pain 150 (1997) ......................................................... 57

L. R. Webster, *Predicting aberrant behaviors in
opioid-treated patients. Preliminary validation of the opioid risk tool*,
 6 Pain Med 432 (2005) .............................................................. 54

Lynn R. Webster & Rebecca M. Webster,
*Predicting Aberrant Behaviors in Opioid-Treated Patients:*
*Preliminary Validation of the Opioid Risk Tool*,
6 Pain Med 432, 433, 439 (2005) ................................................................ 54

Olaf Drummer, et al., *Forensic Science in the Dock:*
*Postmortem Concentrations of Drugs in the Blood have Little Meaning*,
329 BMJ 636-67 (2004)................................................................................ 50

Perry G. Fine & Russel K. Portenoy,
*A Clinical Guide to Opioid Analgesia*, (2004) *available at*
http://www.stoppain.org/pcd/content/forpros/opioidbook.asp .................... 57

R. E. Ferner, *Post-Mortem Clinical Pharmacology*,
 66 British Journal of Clinical Pharmacology 4 (2008)................................ 50

Steven D. Passik, et al., *Pain Clinicians' Rankings of*
*Aberrant Drug-Taking Behavior*,
16 J. Pain & Palliative Care Pharmacotherapy 39 (2002) ........................... 54

Steven D. Passik, *Pain Management Misstatements:*
*Ceiling Effects, Red and Yellow Flags*,
7(1) Pain Medicine 76 (2006)...................................................................... 55

Stuart A. Dunbar & Nathaniel P. Katz,
*Chronic Opioid Therapy for Non-Malignant Pain in*
 *Patients with a History of Substance Abuse: Report of 20 Cases*,
 11 J. Pain & Symptom Mgmt. 163 (1996) .................................................. 57

Timothy P. Rohrig & Nancy G. Ray,
*Tissue Distribution of Buprofin in a Fatal Overdose*,
18 Journal of Analytical Toxicology 343-345 (1992).................................. 49

Timothy P. Rohrig & Richard W. Prouty,
 *Fluoxetine Overdose: A Case Report*,
13 Journal of Analytical Toxicology 305-307 (1989).................................. 49

# RELATED APPEALS

*Linda Schneider v. United States*, No. 08-3099.  This appeal has been

dismissed.

## INTRODUCTION

This case involves difficult questions regarding the medical science and evolving standards in the fields of forensic pathology, and pain management.  The government has presented serious allegations regarding defendant Stephen Schneider's medical practice, and has alleged that in the course of a conspiracy with his wife, defendant Linda Schneider, he caused or played a role in numerous patient deaths.  Given such serious allegations, and the penalties they carry, it would be expected that the government would fully and openly lay out the case against the defendants, particularly its case with respect to causation.

The government has instead sought to shield the scientific evidence from scrutiny, and has evaded its burden to show its reliability.  The government now seeks reversal of the district court exclusion of part of the government's evidence regarding patient deaths.  However, a threshold question is whether the government should be allowed to introduce *any* evidence regarding patient deaths.  Because the government's evidence with respect to the cause of death is unreliable and inadmissible, and the government has actively evaded its burden show otherwise, this Court should exclude all such evidence, and should deny the government's appeal.

## STATEMENT OF JURISDICTION

The government's interlocutory appeal was taken pursuant to 18 U.S.C. § 3731.  This Court may assert jurisdiction over the defendants' cross-appeal under the doctrine of pendant appellate jurisdiction, because the issues presented in their cross-appeal are "inextricably intertwined" with the primary issue presented in the government's appeal. *United States v. Zabawa*, 39 F.3d 279, 283 (10th Cir. 1994) ("[w]e have pendent jurisdiction to review on appeal issues that are otherwise not appealable when raised by an appellant or a cross-appellant").  Furthermore, this Court has jurisdiction over the defendants' cross appeal under the collateral order doctrine because it concerns a decision that is conclusive, effectively unreviewable on appeal, and is separate from the merits of the action. *United States v. Quaintance*, 523 F.3d 1144, 1146 (10th Cir. 2008).[1]

---

[1] The issue of jurisdiction over the defendants' cross-appeal has been fully briefed in response to the government's motion to dismiss for lack of jurisdiction.  The bases asserted in the defendants' response are fully incorporated herein by reference.

## ISSUES PRESENTED FOR REVIEW

*On the government's appeal*:

1.      Did the district court abuse its discretion in finding that evidence of 17 deaths to prove one count of an indictment should be excluded because it is confusing and a waste of time?

2.      Did the district court abuse its discretion in limiting the government's case-in-chief to 10 days?

*On the defendants' cross-appeal*:

3.      Did the district court abdicate its gatekeeping function by failing to require the government to make a preliminary showing of the reliability of its expert testimony?

4.      Did the district court err in failing to exclude the government's proposed expert testimony in light of the Fed. R. Evid. 702 admissibility issues raised by the defendants?

## STATEMENT OF THE CASE

The government's statement of the case with respect to the issues pertaining to its appeal is satisfactory, and the defendants hereby adopt that statement. Aplt. Br. 6-7.  With respect to the issues presented in the cross-appeal, the defendants state as follows:

The defendants moved two separate times for the exclusion of the government's proposed expert testimony pursuant to Fed. R. Evid. 702, or in the alternative for a pre-trial hearing to develop the record with respect to the admissibility of the expert testimony.  Aplee. Supp. App. 55-74, 128-136, 157-166, 262-263. The district court denied both motions.  The court did not exclude any of challenged testimony, and declined to hold a pre-trial *Daubert* hearing.  Aplee. Supp. App. 141-156, 265-276.  The court concluded that all issues raised were issues of weight of the evidence that would be determined by the jury, and therefore all of the government's proposed expert testimony would be admitted.  *Id*.

## STATEMENT OF THE FACTS

### 1.    The Indictment

The second superseding indictment (the "indictment") alleges a number of offenses, including the unlawful distribution of controlled substances in violation of the Controlled Substances Act, 21 U.S.C. 841(a)(1) (the "CSA"), Aplt. App. 72-83, conspiracy, Aplt. Appx. 56-72, health care fraud, Aplt. Appx. 83-97, and various unlawful monetary transactions. Aplt. App. 83-100.  The indictment also sought forfeiture of the majority of the defendants' assets. Aplt. App. 100-107.  The instant appeal

and cross-appeal mainly concern the CSA counts (Counts 2-5). Aplt. App.

72-80.

The CSA criminalizes "drug-dealing" as conventionally understood.

*Gonzalez v. Oregon*, 546 U.S. 243, 270 (2006). Nevertheless, the

allegations with respect to the CSA counts in the 60-page indictment are

focused largely on criticizing Dr. Schneider's medical decision-making. The

indictment takes issue with matters such as Dr. Schneider's decisions on

dosing, escalation of doses, and his prescribing of combinations of

controlled substances. Aplt. App. 61-62. The indictment also finds fault

with the quality of care provided by Dr. Schneider, including such matters as

the quality of the physical examinations he provided, and the thoroughness

of his documentation. Aplt. App. 62-63. The indictment alleges that Dr.

Schneider should have stopped prescribing to patients in light of "obvious"

signs of abuse. Aplt. App. At 61. The indictment also makes mention of 59

deaths in total, but then plainly states that Dr. Schneider neither directly

caused nor contributed to 38 of these deaths.[2] Aplt. App. 108-111

("Attachment 1").

---

[2] Among these deaths is one that the indictment identifies as a suicide. Aplt.
App. 109.

5

**2.     The Motions to Exclude the Government's Proposed Expert Testimony Under Fed. R. Evid. 702, and Related Matters**

Given that this case is heavily concerned with issues of medical science and evolving standards of care, and is heavily based on expert testimony with respect to these issues, the accuracy and reliability of such testimony is particularly important to the truth-seeking process. Recognizing this fact, the defendants have repeatedly sought a rigorous application of the requirements of Fed. R. Evid. 702. Aplee. Supp. App. 55-74, 128-136, 157-166, 262-263.  The defendants raised specific reasons as to why the government's proposed expert testimony should be excluded.  *Id*. Alternatively, they repeatedly requested a more full development of the record with respected to the proffered expert opinions.  *Id*.  The government opposed the defendants' requests, and repeatedly urged the court not to hold evidentiary hearings.  Aplee. Supp. App. 77-114, 230-235.

The defendants also sought access to the autopsy slides of preserved heart tissue, which provides important information regarding the presence or absence of heart disease, and thus valuable insight into the possible cause of death.  Aplee. Supp. App. 75.  The government attempted to preclude the defendants' access to this vital information, characterizing their request as a "fishing expedition."  Aplee. Supp. App. 115-122.  The district court nevertheless granted the defendants' request for access to the slides, which

6

revealed two important things.  First, microscopic review of the slides

revealed that many of the patients indeed had potentially fatal heart disease.

Second, the laboratory that conducted the autopsies in this case, and whose

employees would testify as to cause of death, did not itself review the heart

tissue slides in a large number of cases.  Aplee. Supp. App. 262-263.  The

defendants moved on this basis to exclude the testimony regarding cases

where heart tissue was not examined, but the district court denied the

motion.  *Id*.

The district court also refused to exclude the government's proposed

expert testimony, and refused to require the government to come forward

with a showing of the admissibility of its proposed expert testimony.  Aplee.

Supp. App. 141-156, 265-276.  The district court characterized the

admissibility questions as "weight of the evidence" issues, and held that all

of the government's proposed expert testimony would go to the jury.  *Id*.

### 3.    **The Motion *in Limine* and Ruling**

In the motion *in limine*, the defendants sought the exclusion of patient

deaths under Fed. R. Evid. 403 and "red flags" testimony on several

grounds, including the prejudicial nature of the evidence, its lack of

relevance, the undue delay it would cause, and its lack of reliability

(incorporating by reference the reasons set forth in the Rule 702 pleadings).

Aplee. Supp. App. 285-290.  At the January 26, 2009 hearing, the district

court granted this motion in part, excluding evidence of 17 out of 18 deaths

in Count 5.  The court excluded the testimony pursuant to Fed. R. Evid. 403,

finding the evidence to create a substantial risk of confusion of the jury, and

undue delay.  Aplt. App. 124-125.  The government took the instant appeal,

and the defense cross-appealed.

## SUMMARY OF THE ARGUMENT

The government appeals the district court's exclusion of evidence

regarding 17 patient deaths, all charged in Count 5 of the indictment, which

the court did not dismiss.  The government also appeals the district court's

limitation of its case to 10 trial days.  The government's appeal is without

merit, and should be rejected by this Court.  The defendants cross-appeal

the district court's failure to exclude all expert testimony pertaining to the

cause of patients' death, and seek reversal of that decision, or alternatively,

remand for a full evidentiary development.

I.     The government's first assignment of error largely relies on the

premise that the district court dismissed counts of the indictment, which is

both factually and legally wrong.  Contrary to the government's assertion

that the district court "amended" the indictment, it is plain that the district

court excluded evidence that it found to be confusing and unduly time-

8

consuming. This decision to exclude the evidence pursuant to Fed. R. Evid. 403 was correct as a matter of law, and did not constitute an abuse of discretion.

The district court's exclusion of the evidence is also supported by several other legal grounds. First, the relevance of the evidence was conditioned upon several facts the government could not (or in any event did not intend to) prove. This evidence was therefore excludable under Fed. R. Evid. 104(b). Second, in addition to causing confusion and undue delay, the excluded evidence was also unfairly prejudicial. The inflammatory nature of the evidence, combined with the voluminous and complex nature of the expert testimony required to address it, weigh heavily in favor of the exclusion of the evidence. Third, the exclusion of the evidence was necessary because as charged, Count 5 contained 18 separate and distinct offenses, and the count was therefore duplicitous.

Finally, a proper application of Fed. R. Evid. 702 should have led the district court to exclude all expert testimony suggesting that Dr. Schneider's prescribing caused or contributed to patient deaths, and thus to the exclusion of all evidence regarding patient deaths. This is the subject of the defendants' cross-appeal, which makes two assignments of error, discussed in Part II of this section.

With respect to the time limitation issue raised by the government, the defendants' do not disagree with the government that parties generally should be given sufficient time to present all of their relevant and admissible evidence.  At the same time, the district court has wide discretion to manage its docket efficiently, and the defense is unable to take a position on how long the presentation of the government's case would take, and thus unable to take a position as to whether the district court erred.

II.    On cross-appeal, the defendants challenge the district court's failure to apply Fed. R. Evid. 702 and to exclude the government's proposed expert testimony.

First, the district court failed to exercise its gatekeeping function by failing to require the government to meet its evidentiary burden under Fed. R. Evid. 104(a) to preliminary make a showing of the admissibility of its expert testimony under Fed. R. Evid. 702, in light of the specific challenges to admissibility raised by the defense.  The district court instead reversed the evidentiary burden by requiring the defendants to show that the government's proposed expert testimony was inadmissible.  The district court also erred in failing to allow a full evidentiary development with respect to issues of admissibility, and failing to exclude the government

proposed expert testimony in light of the government's evasion of its evidentiary burden.

Second, even with the burden improperly shifted to the defense, the court should have excluded the government's expert testimony on the basis of the information put forward by the defense as to the lack of reliability of the government's proposed expert testimony.

## ARGUMENT

## I.  THE GOVERNMENT'S APPEAL HAS NO MERIT

### A.  Standard of Review

A district court's decision to exclude evidence under Fed. R. Evid. 403 is reviewed for abuse of discretion.  *Joseph v. Terminix Int'l Co.*, 17 F.3d 1282, 1284 (10th Cir. 1994).  Similarly, a district court's decision to manage its docket is also reviewed for abuse of discretion.  *Harris v. Chand*, 506 F.3d 1135 (8th Cir. 2007).

### B.  The District Court Properly Excluded Evidence of 17 Patient Deaths

The district court's decision to exclude evidence of 17 patient deaths was not an abuse of discretion.  The government's argument should be rejected because it is based on a premise that is demonstrably wrong as a matter of fact, and also lacks any legal support.  Furthermore, the district

11

court's decision is supported by a number of legal grounds on which the court did not expressly rely.

###### 1.  The District Court Properly Exercised its Discretion to Exclude Confusing and Time-Consuming Evidence

The district court's decision to exclude the extraneous deaths in Count 5 of the indictment was a proper exercise of the court's discretion.  The main premise upon which the government prays for reversal – that the district court's exclusion of the 17 deaths was actually a "dismissal" of "part" of the indictment – is both legally and factually wrong.

Count 5 remains in the indictment.  The district court's decision limiting the evidence supporting Count 5 to one patient death does not deprive the government of the opportunity to obtain a conviction on that count, or to prove any element of that count.  It also does not limit the punishment the government can seek on the count.  If convicted, the defendants still face the same penalty of 20 years to life on Count 5 as they did prior to the district court's January 28, 2009 order.

The intent and effect of the district court's decision was to disallow the government to prove one count of violating the CSA, leading to death or bodily injury, using confusing and time-consuming evidence of 18 different alleged violations involving 18 different patients.  The government attempts to characterize the judge's Rule 403 decision as a "dismissal of a portion of

the indictment," Aplt. Br. 16, or a "judicial amendment of the indictment,"

Aplt. Br. 21, suggesting that the lower court's ruling constituted a separation

of powers violation. The record in this case belies that characterization, and

the cases that the government relies upon either fail to support its argument

or actually support the opposite position.

The government quotes a number of cases providing general bromides

regarding the separation of powers between the judiciary and the executive

branch. Aplt. Br. 17-19. Of these cases, only three have any relevance to

the case at bar, and all three suggest that the district court's decision was

appropriate. In *United States v. Zabawa*, this Court reversed the district

court's dismissal of 50 out of 70 counts of an indictment. 39 F.3d 279, 282,

285 (10th Cir. 1994). Similarly, in *United States v. Giannattasio*, the

Seventh Circuit reversed the district court's attempt to force the government

to abandon 10 out of 15 counts, each of which was separately charged in the

indictment. 979 F.2d 98, 100-01 (7th Cir. 1992). In *United States v.*

*DeCologero*, the First Circuit held that a district court could not restrict the

government's proof of related "predicate acts," necessary to show a RICO violation.[3] 364 F.3d 12, 16 (1st Cir. 2004).

These cases highlight the distinction between the impermissible "amendment" of an indictment (meaning the dismissal of actual counts or elements of an offense), and discretionary evidentiary rulings that merely exclude prejudicial, confusing and time-consuming evidence without dismissing actual counts from an indictment. Likewise, courts clearly have the power to strike surplusage from an indictment and to force an election of counts where a count is duplicitous. Fed. R. Crim. Proc 7(d); *United States v. Henry*, 504 F.2d 1335, 1338 (10th Cir. 1974) ("the proper way to attack a duplicitous indictment is by a motion to elect."). Unlike the cases relied

---

[3] The government also generally refers to a number of other cases, apparently to suggest that the trial judge "amended" the indictment. In *United States v. Hill*, 55 F.3d 1197, 1199-1200 (6th Cir. 1995), the Sixth Circuit reinstated part of a count charging the aiding and abetting of the violation of 18 U.S.C. § 1955 under 18 U.S.C. § 2. *See* Aplt. Br. 16. Unlike this case, aiding and abetting constitutes a separate means of commiting the crime charged. Here, the excluded evidence pertains to other alleged crimes, rather than different means of committing the same crime. The government also cites cases in which appeals courts have exercised jurisdiction under 18 U.S.C. § 3731, thereby ~~apparently~~ conflating the jurisdictional question of whether a trial court's decision qualifies as a "dismissal" or "exclusion" – each with its own distinct standard on appellate review. Br. 16-17 (citing *United States v. Nakashian*, 820 F2d 549, 550 (2d Cir. 1987); *United States v. Alberti*, 568 F2d 617 (2d Cir. 1988); *Hill*, 55 F.3d 1197 (6th Cir. 1995)). As this Court's ruling in *Guardia* makes clear, a dismissal or exclusion for purposes of § 3731 jurisdiction does not necessarily establish an improper "judicial amendment" of an indictment.

14

upon by the government, the district court did not dismiss any counts and did not preclude the government from proving the elements of the offense charged.

It is well established that trial courts have the authority – indeed the duty – to exclude evidence that is confusing, misleading, and time-consuming. "The decision to exclude evidence under Rule 403 is within the sound discretion of the trial court, and will be reversed only upon a showing of a clear abuse of that discretion." *United States v. Guardia*, 135 F.3d 1326, 1331 (10th Cir. 1998). "[I]t is entirely appropriate that we accord deference to the trial judge who is most familiar with the circumstances surrounding the issues in question. Such deference is particularly fitting in lengthy trials involving [a] magnitude of highly technical expert testimony." *C.A. Associates v. Dow Chemical Co.*, 918 F.2d 1485, 1489 (10th Cir. 1990) (internal citations omitted); *see also Wheeler v. John Deere Co.*, 862 F.2d 1404, 1410 (10th Cir. 1988) ("[I]f judicial self-restraint is ever desirable, it is when a Rule 403 analysis of a trial court is reviewed by an appellate tribunal." (quoting *United States v. Glover*, 846 F.2d 339, 343 (6th Cir. 1988))).

The district court correctly recognized that evidence regarding 17 patients adduced to prove one count of violating the CSA would be

confusing to the jury and would cause undue delay.  This Court has held that

"[t]he danger of 'confusion of the issues' and 'misleading the jury' arises

when circumstantial evidence would tend to sidetrack the jury into

consideration of factual disputes only tangentially related to the facts at issue

in the current case." *United States v. McVeigh*, 153 F.3d 1166, 1191 (10th

Cir. 1998).  The *McVeigh* Court explained that the danger of such evidence

is that "in attempting to dispute or explain away the evidence thus offered,

new issues will arise as to the occurrence of the instances and the similarity

of conditions, [and] new witnesses will be needed whose cross examination

and impeachment may lead to further issues." *Id.* (quoting 2 John Henry

Wigmore, *Evidence* § 443, at 528-29 (James H. Chadbourn rev., 1979)).

In *United States v. Guardia* this Court affirmed the district court's

exclusion of testimony as confusing under Fed. R. Evid. 403.  135 F.3d at

1332.  *Guardia* involved a gynecologist who was charged with sexually

assaulting two patients.  *Id.* at 1327.  The government sought to present

evidence regarding the treatment of four additional patients under Fed. R.

Evid. 413.  *Id.*  In affirming the exclusion of the evidence, this Court

explained that because the trial would be focused on the propriety of the

medical treatment provided to each patient (each of whom unquestionably

needed medical treatment), the jury would be required to evaluate expert

testimony pertaining to the medical treatment of each patient.  *Id.* at 1332.

The circumstances of the treatment of each patient were "similar but

distinct," and would therefore "make it difficult for the jury to separate the

evidence of the uncharged conduct from the charged conduct."  *Id*. (quoting

23 Charles Alan Wright & Kenneth W. Graham, Jr., *Federal Practice and

Procedure* § 5412, at 273 (Supp. 1997)).  The *Guardia* Court held that

> "[a]dmission of the testimony would transform the trial of two
> incidents into the trial of six incidents, each requiring
> description by lay witnesses and explanation by expert
> witnesses . . . Expert testimony explaining the propriety of Dr.
> Guardia's conduct as to each witness would exacerbate the risk
> of confusion by multiplying conflicting and overlapping
> testimony."

*Id*.

Guardia provides a remarkably close analogy to the case at bar.  Like

*Guardia*, this case boils down to determining whether Dr. Schneider

intended to treat each patient in good faith.  This issue will require the jury

to consider several complex medical concepts necessary to understand pain

treatment, as well as the distinct circumstances pertaining to each individual

patient.  These will include the patient's medical history, the medical

condition that Dr. Schneider was treating, the information that the patient

provided to Dr. Schneider, the patient's tolerance to pain medications, the

patient's compliance with dosing instructions, and the patient's overall

course of treatment (including the medications prescribed, dosages, and changes in dosage over time).  The jury will also have to consider expert opinions as to the propriety of Dr. Schneider's prescribing based on this information.  This evidence will require extensive expert testimony regarding pain treatment. The determination of these issues with respect to each patient will also likely require fact witness testimony.

Similarly, the allegations that Dr. Schneider's prescribing caused or contributed to each patient's death will require extensive expert testimony by pathologists and toxicologists regarding the circumstances of each patient death.  These will include a discussion of the presence of conditions or disease in each patient that could cause sudden death in the absence of drugs, the methods used in conducting each autopsy and the particular findings of each autopsy, and discussion of the properties of each drug involved (which varied from patient to patient).  As the *Guardia* Court recognized, the presentation of such evidence would have the effect of expanding the trial from a consideration of four counts, involving four patients, into a process involving 17 additional mini-trials. Even more than the expert testimony regarding only four additional incidents in *Guardia*, the expert testimony explaining and providing opinions on the treatment and cause of death of 17 patients will be voluminous and overlapping, and will

18

certainly cause jury confusion and needless delay.  *See*, *e.g.*, *C.A. Associates*, 918 F.2d 1485, 1490 (10th Cir. 1990) (upholding district court's exclusion of evidence found to be confusing, waste of time, and prejudicial where "each [item of evidence] added to the list would bring with it a whole history of design, construction, and performance and a whole metallurgical, chemical, and structural analysis" by expert witnesses); *Fed. Deposit Ins. Corp. v. Clark*, 768 F. Supp. 1402, 1414 (D. Colo. 1989) (noting that "[a]n inordinate amount of time would be necessary to delve into the many facets of the settlement of this confusing case"), *aff'd* 978 F.2d 1541, 1553-54 (10th Cir. 1992) (upholding exclusion of evidence of effect of settlement agreement).  Although the analysis would be different had the government charged the offenses individually in separate counts, the government cannot insulate its evidence from the district court's Fed. R. Evid. 403 analysis merely by including it in an indictment.

Although the government suggested below that the evidence of patient deaths could be presented in a "summary" fashion, the district court correctly recognized that the defendants must have a full opportunity to cross-examine the government's witnesses and to put on evidence to defend each allegation, nevertheless.  Furthermore, it is doubtful that the government could make a summary presentation of evidence without

19

violating Fed. R. Evid. 404(b).[4]  *See*, *e.g.*, *United States v. Jones*, 570 F.2d 765, 768-769 (8th Cir. 1978) (reversing CSA conviction of defendant physician where the government introduced evidence regarding 478 uncharged prescriptions without providing any information regarding the doctor-patient relationship nor proof that prescriptions were issued outside of the scope of professional practice upon finding admission of evidence violated Fed. R. Evid. 404(b) and 403).  The district court therefore correctly found that there was no way to avoid significant delay in the presentation of such evidence, because significant time and extensive testimony would be required to establish the relevance of the testimony and its proper use under Fed. R. Evid. 404(b).

For all of these reasons, the district court's decision to exclude evidence regarding 17 patients in Count 5 on the basis that such evidence was confusing and would cause undue delay was based upon sound reasoning, and was not an abuse of discretion.  *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009) ("we have characterized an abuse of

---

[4] The government presumably intended to proceed in a summary fashion by attempting to enter autopsy reports into evidence without producing witnesses to testify,  Aplee. Supp. App. 95-97, 99, thus evading scrutiny as to the methods applied in conducting the autopsies.  Such a course of action is likely prohibited by the Confrontation Clause.  *See Melendez-Diaz v. Massachusetts*, No. 07-591 (U.S. argued Nov. 10, 2008).

discretion as an arbitrary, capricious, whimsical, or manifestly unreasonable judgment." (internal quotations and citations omitted)).

### 2. Other Legal Grounds Support the District Court's Decision

The district court's decision is also supported by a number of other legal grounds not specifically relied on by the district court. *Dandridge v. Williams*, 397 U.S. 471, 475 n. 6 (1970) ("The prevailing party may, of course, assert in a reviewing court any ground in support of his judgment, whether or not that ground was relied upon or even considered by the trial court."); *S. Utah Wilderness Alliance v. Bureau Land Mgmt.*, 425 F.3d 735, 745 n. 2 (10th Cir. 2005) ("An appellee may defend the judgment won below on any ground supported by the record . . ." (internal quotations and citations omitted)).[5]

### a. The Evidence Excluded Was Not Relevant and Should Hajve Been Excluded Pursuant to Fed. R. Evid. 104(b)

The government's proposed evidence regarding the treatment and death of 17 patients was not and is not relevant, and Fed. R. Evid. 104(b) supports the district court's exclusion of the evidence.

---

[5] The inadmissibility of the government's expert testimony under Fed. R. Evid. 702 is a ground supporting the district court's decision. Because the defendants are seeking relief beyond affirming the district court's decision, this ground is discussed in Part II, the cross-appeal.

The threshold question in considering the admissibility of any evidence is whether that evidence is relevant. Fed. R. Evid. 401, 402. The Federal Rules of Evidence anticipate situations in which evidence may or may not be relevant, depending on the existence of a "condition of fact." Federal Rule of Evidence 104(b) provides that

> "[w]hen the relevancy of evidence depends upon the fulfillment of a condition of fact, the court shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition."

Fed. R. Evid. 104(b).

The Supreme Court has held that under Fed. R. Evid. 104(b), prior to admitting evidence whose relevance is dependant on a conditional fact, the district court must determine whether the jury could find the conditional fact by a preponderance of the evidence. *Huddleston v. United States*, 485 U.S. 681, 690 (1988) (citing 21 Charles Alan Wright & Kenneth W. Graham, Jr., *Federal Practice and Procedure* § 5054, at 269 (1977)); *see also United States v. Beechum*, 582 F.2d 898, 912-13 (5th Cir. 1978). The Supreme Court explained that Fed. R. Evid. 104(b) thus "enforces" the relevancy requirement of Fed. R. Evid. 402. *Huddleston*, 485 U.S. at 691.

In cases where the proponent of the evidence must rely upon a conditional fact to establish the relevance of proffered evidence, the district court must make a preliminary finding that the conditional fact exists.

*United States v. Zabaneh*, 837 F.2d 1249, 1262 (5th Cir. 1988). The proponent of the evidence bears the burden of showing the existence of the conditional fact. *United States v. Cote*, 744 F.2d 913, 914, 916 (2d Cir. 1984); *United States v. Cummiskey*, 728 F.2d 200, 205-06 (3d Cir. 1984). The trial court must exclude the proffered evidence where a jury could not find the preliminary fact to exist by a preponderance of the evidence. *See, e.g.*, *United States v. Platero*, 72 F.3d 806, 813-15 (10th Cir. 1995) (citing *Huddleston*, 485 U.S. at 687, 689-90) (reversing district court's exclusion of evidence after finding that a jury *could* find the existence of the condition fact by a preponderance of the evidence); *United States v. Ridlehuber*, 11 F.3d 516, 522 (5th Cir. 1993); *United States v. Allocco*, 801 F. Supp. 1000, 1006 (E.D.N.Y. 1992).

The government asserts that the purpose of presenting evidence of the additional 17 patient deaths is to show that the defendants had "notice" of the dangerousness of their prescribing. Aplt. Br. 16. The government has been very general in stating its notice theory in the court below, and its appellate brief fails to provide any explanation of this theory. While the government has failed to clearly articulate its evidentiary hypothesis, some information can nonetheless be gleaned from the government's filings in the district court. *See, e.g.*, Aplee. Supp. App. 93-94. These filings suggest that

the government intended to argue that the number of deaths at the Schneider

Medical Clinic was aberrant, and that it should have "put any reasonable

physician on notice that his prescribing practices were deadly." *See*, *e.g.*,

Aplee. Supp. App. 93-94, 314, 328, 331, 333, 339, 358, 359, 360, 365.

However, the government's presumed notice theory poses a number

of significant relevancy problems that would preclude the presentation of the

proposed evidence under Fed. R. Evid. 104(b).  First, the government's

theory assumes that the patients died due to mixed-drug intoxication, rather

than some other cause.  As discussed more fully *infra*, there is no reliable

scientific method by which to determine that a patient's death was caused by

mixed-drug intoxication in opioid-tolerant patients with other life-

threatening disease present.  This is true of the patient population at issue.

Second, even assuming *arguendo* that the patient deaths were caused

by mixed-drug intoxication, this fact alone does not establish the relevancy

of the evidence according to the government's theory.  Because most

medical practices, particularly those treating chronically ill patients, exhibit

"some" rate of patient mortality, the presentation of a given number of

patient deaths to a jury without reference to is certain to be misleading. The

relevancy of the government's proposed evidence is conditioned on the

existence of a mortality rate significantly greater than normal for a

comparable population.  In order to show that Schneider Medical Clinic

patients had an abnormally high rate of mortality, the government must

compare that rate to the rate among comparable patient populations in

comparable medical practices. The government's proposed evidence is not

admissible unless the government makes some showing that would allow the

jury to reach the conclusion that the rate of death for Dr. Schneider's

practice was unmistakably higher than for a comparable population treated

by a doctor whose rate of death was not statistically aberrant. The

government's expert disclosures reveal that the government never intended

to make such a showing.  *See generally* Aplee. Supp. App. 301-372.

Rather, the government simply intended to tell the jury that the rate of death

was aberrant without laying the proper foundation.

Finally, there are a number of other conditional facts on which the

admission of the government's proposed evidence depends.  For example,

the government would have to establish that Dr. Schneider had knowledge

that the deaths were caused by mixed-drug intoxication; that the patients

took the medications as prescribed by Dr. Schneider or, if the patients did

not take the medications as prescribed, that Dr. Schneider knew they were

disregarding his instructions; or, that the patients did not die as a result of

recreational drug use with substances not prescribed by Dr. Schneider.

This court has reversed a conviction in a similar case.  In *United States v. Cardall*, this Court reversed the conviction of a criminal defendant who appealed the admission of evidence regarding the unlawful conduct of his co-defendants and others where there was no evidence in the record that he was involved in such conduct.  885 F.2d 656, 671-72 (10th Cir. 1989).  The Court held that the Fed. R. Evid. 404(b) "bad acts" evidence should not have been admitted because such evidence could not have survived a Rule 104(b) conditional relevance determination.  *Id*.  Relying on *United States v. Kendall*, 766 F.2d 1426, 1436 (10th Cir. 1985), the Court explained that the government must "articulat[e] precisely the evidentiary hypothesis by which a fact of consequence may be inferred from the evidence of other acts."  *Cardall*, 885 F.2d at 671.

In the present case, it is clear from the record below that the government did not intend to make, and could not make, the requisite showing of conditional facts that would make the evidence of patient deaths relevant to support its theory of notice.  Therefore, the proposed evidence lacks a foundation and should have been excluded under Fed. R. Evid. 104(b).

### b.    The Evidence Excluded Was Unfairly Prejudicial

Fed. R. Evid. 403 provides for the exclusion of evidence that is unfairly prejudicial.  Fed. R. Evid. 403.  Evidence should not be admitted if it has "an undue tendency to suggest the jury make a decision on an improper basis, commonly, though not necessarily, an emotional one." *United States v. Martinez*, 938 F.2d 1078, 1082 (10th Cir. 1991) (quoting Fed. R. Evid. 403 advisory committee's note).

The nature of the evidence that the government seeks to introduce in this case creates a particularly high risk that the jury will make a decision on an emotional basis.  The mere suggestion that Dr. Schneider was responsible for the deaths of over 20 patients creates a substantial risk that the passion of the jury will be so inflamed that the jury will be unable to engage in a rational analysis of the evidence adduced at trial and will render its decision on an improper basis.  In such a complex case, there is a substantial risk that the jury will improperly base its decision on sympathy for the deceased patients. *Thompson v. State Farm Fire and Cas. Co*., 34 F.3d 932, 940 (10th Cir. 1994) (recognizing the prejudicial effect of testimony likely to evoke the jury's sympathy). There is also a significant risk that the jury will be motivated by its instinct to punish the defendants when faced with such evidence. *United States v. McManaman*, 606 F.2d 919, 926 (10th Cir. 1979).

These risks are particularly significant where the jury is called upon to engage in a careful analysis of voluminous and complicated scientific testimony.

All of these reasons support the exclusion of this evidence as unfairly prejudicial under Fed. R. Evid. 403, particularly when juxtaposed with the lack of foundation to establish their conditional relevancy, as discussed in Part I(B)(2)(a) above.  The Supreme Court has held that even if the evidence is deemed to meet the minimum threshold requirements of Fed. R. Evid. 104(b), the evidence must then satisfy the probative-prejudice balancing test of Fed. R. Evid. 403.[6]  *Huddleston*, 485 U.S. at 691.  Furthermore, the failure to exclude evidence of marginal relevance under Fed. R. Evid. 104(b) is reversible error due to the prejudicial impact such evidence may have on a jury's decision-making.  *See*, *e.g.*, *United States v. Ridlehuber*, 11 F.3d 516, 523 (5th Cir. 1993).

---

[6] Similarly, court's must apply Fed. R. Evid. 403 to evidence in light of reliability issues raised under Fed. R. Evid. 702, and may exclude evidence based on its marginal reliability even if it may be admitted under Fed. R. Evid. 702.  The reasons for exclusion under Fed. R. Evid. 702 discussed in Part II also support exclusion under Rule 403.

Therefore, even if the government's evidence is deemed to meet the minimum threshold of admissibility under Fed. R. Evid. 104(b), the evidence should be excluded because of its overly prejudicial nature.[7]

### c. The Limitation of Count 5 to One Patient was Necessary Because the Excised Deaths Were Duplicitous

The district court's decision limiting Count 5 to one patient was also correct in that the count was duplicitous as charged.

Duplicity is defined as the joinder of two or more distinct and separate criminal offenses in the same count of an indictment. *United States v. Wiles*, 102 F.3d 1043, 1061 (10th Cir. 1996) (citing *United States v. Haddock*, 956 F.2d 1534, 1546 (10th Cir. 1992)), *reh'g in part*, 961 F.2d 933 (10th Cir.); *see also United States v. Dashney*, 937 F.2d 532, 540, n. 7 (10th Cir.) ("Duplicity refers to the inclusion of various offenses in a single count of an indictment").  The *Wiles* Court explained that duplicity presents the danger that "[a] jury may convict a defendant without unanimously agreeing on the same offense." 102 F.3d at 1061 (citing *United States v. Sasser*, 971 F.2d 470, 477, n. 5 (10th Cir. 1992).  However, an indictment that charges several

---

[7] Furthermore, Fed. R. Evid. 403 militates for the exclusion of expert testimony the prejudicial value of which outweighs its reliability.  As discussed in Part II. *infra*, the expert testimony proffered by the government was unreliable, and should have been excluded pursuant to Fed. R. Evid. 702 and 403.

different *means* of committing the same offense is not duplicitous. *United States v. Jaynes*, 75 F.3d 1493, 1502 n. 7 (10th Cir. 1996); *United States v. Browning, Inc.*, 572 F.2d 720, 725 (10th Cir. 1978).

Count 5 charges 18 distinct offenses. The count alleges a violation of section 841(a)(1) causing or contributing to the death of 18 different patients, each requiring proof of additional, separate, and wide-ranging facts.[8] The government concedes this point in its brief: "[each of the 17 excluded deaths] constitutes a separate statutory violation, which could have been separately pleaded as a discrete offense." Aplt. Br. 21. The government also implicitly concedes the point in the indictment by charging similar alleged CSA violations separately and individually in counts 2-4. Aplt. App. 72-79.

By charging 18 separate offenses, Count 5 presents precisely the problem that the rule against duplicity seeks to avoid. The jury, receiving evidence regarding the treatment and death of 18 different people, may well disagree as to which offense the defendants actually committed. While a unanimity instruction is typically used to avoid this outcome, this Circuit has

---

[8] *See Blockburger v. United States*, 284 U.S. 299, 304 (1932). Courts have traditionally applied the *Blockburger* test to determine if an indictment alleges one crime or separate crimes by determining whether one count requires proof of a fact that the other does not. *See*, *e.g.*, *United States v. Buchanan*, 485 F.3d 274, 278 (5th Cir. 2007).

30

recognized that unanimity instructions may not be used in cases "with exceptionally complex facts" and "cases with a tangible indication of jury confusion." *United States v. Sasser*, 971 F.2d 470, 478, n. 7 (10th Cir. 1992). Given the complex and voluminous nature of the expert testimony in this case, a unanimity instruction cannot be relied upon to cure the duplicity.

Despite its concession that Count 5 charges 18 separate and distinct offenses, the government argues that such charging is not duplicitous because the separate offenses are part of a "common scheme or course of conduct." Aplt. Br. 21.  The cases cited by the government do not support its argument.  In determining whether multiple offenses can be charged in one count, courts consider the legislative intent behind the charging statute.  *See* 1A Charles Alan Wright & Kenneth W. Graham, Jr., *Federal Practice and Procedure* § 142 ("at its core, the issue of duplicity or multiplicity is one of statutory interpretation") (citing authorities).  Thus, the court in *United States v. Shorter*, 809 F.2d 54, 57 (D.C. Cir. 1987), on which the government relies, determined that the legislative history of 26 U.S.C. Sec.

7201 allowed the government to charge a single scheme to violate the statute over several years in one count.[9]

Unlike the statute at issue in *Shorter*, the text and legislative history of the CSA do not support charging multiple offenses involving different patients and different controlled substances prescribed on different dates. *See United States v. Thompson*, 624 F.2d 740, 742-43 (5th Cir. 1980) (discussing legislative intent of section 841(a)(1) and rejecting argument that the CSA did not intend to criminalize separately three different prescriptions issued to the same patient on the same day); *United States v. Cooper*, 966 F.2d 936, 944 (5th Cir. 1992) ("We conclude that the maintenance of a crack house constitutes a separate offense each day it is continued. This Circuit has upheld multiple convictions, as long as they encompass separate transactions, even if motivated by a single financial scheme.") (citing

---

[9] The government also cites two Tenth Circuit cases, neither of which is on point. In *United States v. Jaynes*, a case in which the defendant did not challenge the indictment as duplicitous, the Court acknowledged that charging multiple offenses in one count in the context of a scheme court could be problematic in that the jury may not agree "unanimously on the particular acts constituting the offense alleged in that count." 75 F.3d 1493, 1502 n. 7 (10th Cir. 1996). *Jaynes* involved a count charging multiple instances of forgery of Treasury checks in an ongoing scheme. In *United States v. Browning*, this Court did not actually decide whether the count at issue was duplicitous. 572 F.2d 720 (10th Cir. 1978). Rather, the Court drew a distinction between a count charging several offenses and several means of committing the same offense, and remanded to the district court for a determination. *Id.* at 725.

multiple cases); *United States v. Lartey*, 716 F.2d 955, 967 (2d Cir. 1983) ("Courts resolving this issue have uniformly held that separate unlawful transfers of controlled substances are separate crimes under § 841, even when these transfers are part of a continuous course of conduct."); *United States v. Sugar*, 606 F. Supp. 1134, 1144 (S.D.N.Y. 1985) ("It is clear that each individual transfer of controlled substances, outside the scope of professional medical practice, is a crime punishable separately under 21 U.S.C. § 841"); *see also United States v. Smith*, 941 F. Supp. 985, 997-98 (D. Kan. 1996) (finding duplicitous a count charging violation of 18 U.S.C. § 924(c)(1) in relation to two separate drug trafficking offenses). The conduct at issue cannot be characterized as a single scheme because of the diverse circumstances involving each patient, as well as the fact that the government does not contend that the entire Schneider Medical Clinic was a scheme and that no patients received legitimate medical care.

The fact that Count 5 was duplicitous, and could not have proceeded to the jury as charged, further supports the district court's decision to limit the count to one patient.

For all of these reasons, this Court should affirm the district court's exclusion of evidence.

## C.     The District Court's Decision to Limit the Length of Trial

District courts have the inherent authority to control their dockets.

*United Steelworkers of America v. Oregon Steel Mills, Inc.*, 322 F.3d 1222,

1227 (10th Cir. 2003); *Anthony v. BTR Auto. Sealing Sys.*, 339 F.3d 506, 516

(6th Cir. 2003) ("[T]rial courts have inherent power to control their

dockets").  Despite the government's contentions, this includes not only the

authority but also the *duty* to set reasonable limits before trial for the overall

length of time for a particular trial and hold parties to those limitations.

*Borges v. Our Lady of Sea Corp.*, 935 F.2d 436, 442-43 (1st Cir. 1991)

("[F]ederal district judges not only may but must exercise strict control over

the length of trials, and are therefore entirely within their rights in setting

reasonable deadlines in advance and holding the parties to them. . . ."

(quoting *Flaminio v. Honda Motor Co*., 733 F.2d 463, 473 (7th Cir. 1984)));

*MCI Communications Corp. v. American Tel. & Tel. Co.*, 708 F.2d 1081,

1171 (7th Cir 1982) ("The time limits ordered by [the district judge] had the

effect of excluding cumulative testimony . . . [by setting a] fixed a period of

time for the trial as a whole. This approach is not, per se, an abuse of

discretion.")  This mandate is easily found in many of the cases cited by the

government, but suspiciously absent from the government's brief.[10]  A

district court cannot arbitrarily set time limits without considering the

evidence necessary for each party to make its case, however a district court

does have wide discretion in setting time limits after reviewing each party's

proffered testimony and evidence.  *Id.*; *Duquesne Light Co. v. Westinghouse*

*Elec. Corp.*, 66 F.3d 604, 609-10 (3d Cir. 1995) ("[A] district court should

impose time limits only when necessary, after making an informed analysis

based on a review of the parties' proposed witness lists and proffered

testimony, as well as their estimates of trial time.").  This includes setting

time limits which would not allow the party to present all proffered

evidence, but instead force each party to streamline their own case and

choose for themselves how to avoid needless presentation of cumulative

evidence without having the court to make all such decisions and infringe

upon the parties' ability to put on their cases as they see fit.  *Id.*; *see*

---

[10] *See*, *e.g.*, the Government's discussion of *Flaminio*.  Aplt. Br. 25.  "In
*Flaminio* . . . the Seventh Circuit strongly disapproved of the practice of
placing rigid time limits on a trial." Aplt. Br. 25 (emphasis added).  To the
contrary, in *Flaminio* the Seventh Circuit held that district courts "must
exercise strict control over the length of trials." 733 F.2d 463, 473 (emphasis
added).  The Government mischaracterizes the Seventh Circuit's holding,
which was more about setting rigid hour limitations and distracting time-
keeping methods.  *See United States v. Vest*, 116 F.3d 1179, 1187 (7th Cir.
1997) (discussing *Flaminio*).

*generally United States v. Reaves*, 636 F. Supp. 1575 (E.D. Ky. 1986); *see generally United States v. Hildebrand*, 928 F. Supp. 841 (N.D. Iowa 1996)

While the undersigned counsel cannot read the mind of the trial court, the court's decision to limit the length of the government's presentation may well have been based on its recognition that the government's case is oppressive, Aplt. App. 130, and that its presentation at trial would be oppressive as well.  Given the government's actions in this case, including its multiple attempts to exclude defense counsel, Aplt App. 9, 18, attempts to gag family members of the defendants and political organizations not parties to the litigation, Aplt App. 11 (Doc. 57), the government's efforts to preclude the defendants' access to autopsy slides providing valuable information regarding patients' heart conditions,  Aplee. Supp. App. 115-122, and the government's intention to put on evidence of 38 patient deaths that the indictment plainly states the defendants did not "contribute to" or "cause," Aplt. App. 108-11, the court below may well have concluded that when limited to relevant and admissible evidence the time provided would be sufficient for the presentation of the government's case.

This being said, the defense agrees with the government's assertion that the court cannot unreasonably and inflexibly limit a party's presentation of relevant and admissible evidence.  While the defendant also agree with

the district court regarding the oppressive nature of the government's case, and take the view that the government will likely attempt to inject prejudicial and irrelevant matter into the trial given its previous conduct, we are unable to take a position on the length of time necessary for the government's presentation of relevant, admissible evidence, and therefore simply lack the information to state whether the district court exceeded its authority.

## II.    THE DISTRICT COURT SHOULD HAVE EXCLUDED ALL OF THE GOVERNMENT'S PROPOSED TESTIMONY REGARDING CAUSE OF DEATH

This court should also consider the issues surrounding the purported expert testimony surrounding the deaths and other issues. As this court is well aware, it is hornbook law that a lower court decision must be upheld if other grounds supporting the decision are present.  As such, the court must review the lower court's destruction of the *Daubert* standard, as codified in Fed. R. Evid. 702, which if properly applied, would support the lower court's later decision to exclude the resulting evidence.

### A.    Standard of Review

The issue of "whether the district court employed the proper legal standard and performed its gatekeeper role" is reviewed *de novo*. *United States v. Rodriguez-Felix*, 450 F.3d 1117, 1122 (10th Cir. 2006).  If the

Court finds that the district court performed its gatekeeping role, this Court

reviews for abuse of discretion to determine whether its decision is

"arbitrary, capricious, whimsical or manifestly unreasonable," or "the

district court made a clear error of judgment or exceeded the bounds of

permissible choice in the circumstances." *Dodge v. Cotter Corp.*, 328 F.3d

1212, 1223 (10th Cir. 2003). "Though the district court has discretion in

*how* it conducts the gatekeeper function, we have recognized that it has no

discretion to avoid performing the gatekeeper function." *Id.*

As discussed more fully below, the district court abdicated its

gatekeeping function and failed to employ the proper legal standard.

Therefore, this Court should review the district court's decisions *de novo*

and reverse. Even under the more deferential standard of review, the district

court's decision was an abuse of discretion.

### B.    Applicable Law

Federal Rule of Evidence 702 provides that testimony regarding

scientific, technical, or other specialized knowledge is admissible if

> "(1) the testimony is based upon sufficient facts or data, (2) the
> testimony is the product of reliable principles and methods, and (3)
> the witness has applied the principles and methods reliably to the facts
> of the case."

Fed. R. Evid. 702.  The Rule also requires that expert providing the testimony must be qualified, and that the testimony must be helpful to the trier of fact to determine a fact in issue.  Id.

Fed. R. Evid. 702 codifies the holdings of the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993), and *Kumho Tire v. Carmichael*, 526 U.S. 137 (1999) (holding that the reliability requirements of *Daubert* apply to all testimony of a scientific or technical nature).  In *Daubert*, the Supreme Court listed several non-exhaustive factors to be applied by courts in determining whether proposed expert testimony is sufficiently reliable to be admitted.  These include evaluating whether the testimony has been, or can be, tested, *Daubert*, 509 U.S. at 593, "whether the testimony has been subjected to peer review or publication," *Id.*, what is the "known or potential rate of error [of a scientific technique]," *Id.* at 594, and whether a methodology or technique has "general acceptance" within a "relevant scientific community." *Id.* at 592-594.

Under Fed. R. Evid. 702, the trial court is vested with the important role of gatekeeper.  *Id.* at 592.  In this role, the trial court must ensure that prior to admitting expert testimony, it is preliminarily shown to be reliable.  The burden to show this reliability is on the proponent of the evidence, *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 970 n.4 (10th Cir. 2001),

who must demonstrate the reliability of the testimony by a preponderance of the evidence in accordance with Fed. R. Evid. 104(a).  Fed. R. Evid. 702, advisory committee note to 2000 amendments.

The requirements set forth in Fed. R. Evid. 702 apply with equal force in both civil and criminal proceedings.  *See*, *e.g.*, *United States v. Nacchio*, No. 07-1311 (10th Cir. filed Feb. 26, 2009)(en banc), *available at* http://www.ca10.uscourts.gov/opinions/07/07-1311.pdf.

The district court failed to apply the requirements of Fed. R. Evid. 702 with respect to the government's proposed expert testimony.  As discussed in Part II(c) *infra*, the court did not require the government to meet its evidentiary burden, and did not apply the *Daubert-Kumho* criteria to the proposed expert testimony.  Had the district court exercised its gatekeeping function and considered the proposed testimony and its purported bases (discussed in Part II(D), *infra*) the district court should have excluded the testimony.

> **C.** **The Government Failed to Meet Its Burden Under Fed. R. Evid. 702, and its proposed expert testimony should have been excluded**

> **1.** **Background**

In their initial motion to exclude the government's expert testimony or hold a *Daubert* hearing, the defendants specifically set forth the reasons as to

why the government's expert testimony was inadmissible under Fed. R.

Evid. 702.[11]  Aplee. Supp. App. 49-66.  The motion contained a discussion

of the reasons why the government's proposed testimony regarding patients'

cause of death failed to meet the reliability criteria of Fed. R. Evid. 702 and

*Daubert-Kumho*, as well as the unreliability of testimony pertaining to "red

flags," or aberrant drug-related behaviors ("ABRDs").  *Id.*  The points with

respect to lack of methodology and reliability were largely supported by

citations from medical literature.  *Id.*  The defendants moved for the

exclusion of the government's proposed expert testimony, and in the

alternative requested a *Daubert* hearing, at which they could question the

government's witnesses regarding their methodology. Aplee. Supp. App. 51,

74.

    The government's response generally argued that all of the points

raised in the *Daubert* motion went to the "weight of the evidence," rather

than admissibility.  Aplee. Supp. App. 78, 88-90.  The government's

response did not adequately address the specific points raised with respect to

the lack of methodology or lack of reliability of the government's proposed

evidence. Aplee. Supp. App. 92-106.  Instead, the response was generally

devoted to evading the specific issues raised by the defendants, employing

---

[11] These reasons are discussed more fully in Part II(D).

circular reasoning, and generally using the results of the flawed

methodologies employed by government experts to attempt to prove the

reliability of those very methodologies.[12]  *Id.*  The government vigorously

opposed holding a *Daubert* hearing.  Aplee. Supp. App. 91, 107, 113.

     The district court did not require the government to come forward

with any evidence showing the reliability of its proposed expert testimony in

light of the points raised by the defendants.  The court criticized the

defendants for failing to cite authorities[13] supporting the points with respect

---

[12] The government's responses to the points presented, as well as their
deficiencies, are set forth in footnotes to the discussion in Part II(D), *infra*.

[13] Contrary to the district court's assertion, the motion to exclude contained
numerous citations.  Aplee. Supp. App. 52-66.  Although the court did not
request these sources and initially ruled without considering them, the
defendants subsequently provided them to the court in their motion to
reconsider.  *Id.* at165-66; *see generally Id.* at 167-229 (only the exhibits
relevant to this appeal are incorporated into the Supplemental Appendix).
Furthermore, the defendants did not bear the burden to prove unreliability,
and the reasons for inadmissibility are fully and specifically set forth and
discussed in the papers.  *Id.* at 50-51, 158-59.  The defendants did not simply
make an unsupported assertion, but rather based their arguments on
extensive consultations with Dr. Steven Karch, a prominent and well-
respected pathologist who would substantiate this point if called to testify at
a pretrial *Daubert* hearing.  Further, there is no rule that requires the
opponent of expert testimony to cite an academic article for each question
raised, as the burden remains with the proponent of the evidence.  The
undersigned counsel have reviewed the Fed. R. Evid. 702 submissions of the
government at the trial level in *Nacchio*, which do not contain extensive
citations to academic authorities, but which this Court nevertheless found to
be thorough and specific.  No. 07-1311 (10th Cir. filed Feb. 26, 2009)
(relevant motions available on PACER)

to lack of scientific rigor, and for failing to adequately show that the government's proposed expert testimony was unreliable and inadmissible. Aplee. Supp. App. 148, 151.  The court, like the government, did not address defendants' objections, but held that the procedures employed by the government's experts – reviewing autopsy reports, toxicology reports, and tissue samples to determine cause of death, and reviewing patient files and prescriptions to determine propriety of prescribing – were reliable "methods." [14]  *Id*.  The court erroneously held that these were all "battle of the experts" issues more properly determined by a jury, and declined to hold a *Daubert* hearing or to require the government to come forward with any more evidence showing admissibility (evidence the defense contends is unavailable to the government because it does not exist).  *Id*. at 148-49, 155.

The defendants subsequently filed a motion to reconsider, in which they attempted to clarify their points and arguments in light of the district

---

[14] On this point, the court also stated that the defendants' expert, Dr. Karch, relied on the same methodologies (autopsy reports, toxicology reports, and tissue slides) to reach his conclusion.  Aplee. Supp. App. 148.  However, the nature of Dr. Karch's opinion was entirely different in that he was opining that there was no reliable method available to either side to determine cause of death under the particular circumstances present in these deaths *Id*. at 158-59, 240.  Further, the district court qualified Dr. Rohrig, a toxicologist who is not an M.D. and therefore not qualified to conduct autopsies and render differential diagnoses as to the cause of death, as a "highly experienced pathologist" who would be allowed to opine on the cause of death.  *Id*. at 147-48.  The defendants subsequently raised these points, but they did not alter the district court's decisions.  *Id*. at 158.

court's holding. *See generally*, Aplee. Supp. App. 157-63.  The motion asserted that the court failed to analyze the government's proposed testimony under any of the *Daubert* criteria, that the court misconstrued the nature of the opinions of their expert, that the court failed to fully address the issues raised with respect to the lack of reliability of the government's proposed testimony, and that the court improperly shifted the burden to defendants to show a lack of reliability.  *Id.*  The defendants urged the court to reconsider its decision and to hold a *Daubert* hearing.  *Id.* at 157-63, 237-40.  The government opposed the reconsideration, and again argued that a *Daubert* hearing was not necessary.  *Id.* at 230-35.  The district court this time considered several of the articles submitted by the defendants, but again held that they "failed to demonstrate" that a reconsideration of the prior order or a *Daubert* hearing is necessary. *Id.* at 274.  The court also rejected the defendants' contention that the court shifted the burden to them to disprove reliability, stating they failed to state reasons why a hearing was necessary and that the evidence was established to be reliable and the experts qualified. *Id.* at 274-75.

## 2.     Argument

The government failed to satisfy its burden under Fed. R. Evid. 104(a) to preliminarily show the reliability of its evidence.  This Court recently re-

affirmed in *Nacchio* that "[t]he party offering the expert 'must show that the method employed by the expert . . . is scientifically sound and that the opinion is based on facts which satisfy Rule 702's reliability requirements.'" *United States v. Nacchio*, No. 07-1311, at 14-15, 21, 36 (10th Cir. filed Feb. 26, 2009) (citing *Dodge*, 328 F.3d at 1222; *Ralston*, 275 F.3d at 970 n.4). Rather than affirmatively coming forward with any such evidence, or asking the court to provide an opportunity to establish reliability, the government and then the court repeatedly evaded the specific issues raised. The government thus failed to satisfy the requirements of Fed. R. Evid. 702, and its evidence should have been excluded. *See Nacchio*, No. 07-1311, at 16 (upholding the exclusion of expert testimony where "the [proponent of the expert testimony] has made no attempt to comply with Rule 702 or *Daubert* and establish that [the expert's] testimony is the product of reliable principles and methods or that [the expert] applied some principles and methods reliably in this case). The government, far from seeking an opportunity to show the admissibility of its evidence through a hearing or otherwise, as required under *Nacchio*, repeatedly sought to avoid such scrutiny. *Id.*, No. 07-1311, at 31.

The district court also failed to follow the requirements of Fed. R. Evid. 702 and abdicated its gatekeeping function. This Court recently

explained that "even when a party does not timely raise a *Daubert* objection, 'the trial judge is assigned the task of insuring that an expert's testimony rests on a reliable foundation and is relevant . . .'" *Nacchio*, No. 07-1311, at 25 (quoting *Macsenti v. Becker*, 237 F.3d 1223, 1231-32 (10th Cir. 2001)). While the defendants' motions, like those of the government in *Nacchio*, "explicitly set forth authority and analysis regarding FRE 702's mandate that the expert testimony be the product of reliable principles and methods, and . . . offered detailed reasons why those specific opinions did not meet this methodology requirement," the district court failed to require the government to carry its burden to show admissibility. *Nacchio*, No. 07-1311, at 25 (internal quotations and citations omitted).  Because the district court did not require the government to make such a showing, it could not then adequately evaluate that showing under the criteria set forth in *Daubert-Kumho*.

The district court's failure to require the government to meet its burden in the face of the defendants' specific arguments and requests for a more full development of the record had the effect of reversing the evidentiary burden. Far from admitting the entirety of the government's proposed expert testimony, the district court should have excluded such

testimony because of the government's repeated efforts to evade its

evidentiary burden.

> **D.    The Government's Proposed Expert Testimony Is Inadmissible Under Fed. R. Evid. 702**

>> **1.    The Lack of Methodology to Rule Out Alternative Causes of Death**

Heart disease is the most common cause of death in this country.

Deaths due to cardiac disease often produce no unique pathological findings,

or at least none that are grossly visible on post-mortem examination.

However, extensive microscopic examination of preserved heart tissue can

reveal the presence of common and lethal forms of heart disease.  Without

such microscopic examination, heart disease cannot be ruled out as the sole

cause of death in an individual whether they have measurable levels of

opioids in their bodies or not. While findings of, for example, pulmonary

edema or cerebral edema are consistent with overdose death, they are

sometimes used to support an opinion that death was due to excessive fluid

resuscitation, or simple heart failure. Under these circumstances, there is no

way to "test" for the actual cause of death. In order to do so, it would be

necessary to bring the patient back to life.  Consequently, there is no way to

know the error rate or accuracy of a medical examiner's determinations under the circumstances presented in this case.[15]

While medical examiners often provide their best guess as to the cause of death under these circumstances, the question of whether such conclusions are admissible under Fed. R. Evid. 702 is a different question. This Court has previously recognized that in order to be admissible, the differential diagnosis performed must reliably rule in and rule out alternative causes. *Hollander v. Sandoz Pharms.*, 289 F.3d 1193, 1211-1212 (10th Cir. 2002). For the reasons set forth here, and in the district court, there is no

---

[15] In its response to this point, the government stated that the cause of death is determined by "applying well-known pathology and toxicology methods of observation and testing to gather facts and by then drawing an informed conclusion from those facts." Aplee. Supp. App. 95. This is beside the point. The government did not describe how it overcomes the particular problem their experts face in attempting to reliably determine cause of death in the presence of these unique facts. The government also stated (as if it were dispositive of the issue at hand) that autopsy reports are reliable, and that they can be admitted. *Id.* at 95-96. The government then stated in one of many evasive arguments that heart disease was not the cause of death of the patients in this case because heart disease was not found to be the cause of death. *Id.* Finally, the government stated that the cause of death was not due to heart disease because as a general matter, when there is no sign of tissue damage, but "obvious" and "tell-tale" signs of overdose, the death can be attributed to overdose. *Id.* at 95. This last point completely ignores the fact that the government's own autopsies reflected deadly heart disease in some patients, while in a large number of other cases the government did not conduct histological exams and therefore could not know if a patient had life-threatening heart disease, since heart disease is often not grossly visible. It also ignored the point made by the defendants that signs of death due to heart disease and signs of death due to overdose are often times one in the same.

reliable method to rule out two competing causes in the circumstances presented here.  Therefore, the government's proposed testimony should have been excluded pursuant to Fed. R. Evid. 702.

### 2. The Lack of Reliability of Post-Mortem Toxicology Findings

Post-mortem toxicology levels, relied on by the government's witnesses in reaching their conclusions that the patients died of mixed-drug intoxication, are not reliable for at least two reasons.  First, the drugs at issue in this case are basic in nature, and have physical properties that cause their concentration to increase greatly[16] after death, particularly where the sample is drawn from the heart (as it was in many of these cases). This fact alone makes it impossible to determine whether a person suffered a drug overdose. Timothy P. Rohrig & Nancy G. Ray, *Tissue Distribution of Buprofin in a Fatal Overdose*, 18 Journal of Analytical Toxicology 343-345 (1992) (Aplee. Supp. App. 259-61); Timothy P. Rohrig & Richard W. Prouty, *Fluoxetine Overdose: A Case Report*, 13 Journal of Analytical Toxicology 305-307 (1989) (Aplee. Supp. App. 168-70).

Second, because of the phenomenon referred to as tolerance, (the decrease in both the positive and adverse effects of a drug as use of the drug continues over time or the dose is increased) post-mortem opioid

---

[16] This phenomenon is referred to as a high volume of distribution.

concentrations in patients receiving large, regular doses of opioids over a significant period of time tell the examiner nothing dispositive.  There is no reliable method to measure tolerance at the time of autopsy, and therefore no reliable conclusion can be drawn as to what effect the drug exerted on the tissue, especially in the presence of other life-threatening disease.  *See* R. E. Ferner, *Post-Mortem Clinical Pharmacology*, 66 British Journal of Clinical Pharmacology 4 (2008) (Aplee. Supp. App. 172-85); Beth F. Jung & Marcus M. Reidenberg, *Interpretation of Opioid Levels: Comparison of Levels from Chronic Pain Therapy to Levels From Forensic Autopsies*, 77(4) Clinical Pharmacology & Therapeutics, volume 324-34 (2005) (Aplee. Supp. App. 247-57); Olaf Drummer, et al., *Forensic Science in the Dock: Postmortem Concentrations of Drugs in the Blood have Little Meaning*, 329 BMJ 636-67 (2004) (Aplee. Supp. App. 244-45).[17]

---

[17] In response to this point, the government replied that its toxicologist, Dr. Rohrig, relied on a treatise entitled Disposition of Toxic Drugs and Chemicals in Man, by Randall C. Baselt. Aplee. Supp. App. 97-98.  The defendants subsequently noted that this treatise is not peer-reviewed.  *Id.* at 159.  The government further stated that the medical examiner receives information about the length of time an individual receives medication, as well as dosage levels.  *Id.* at 98.  Neither of these points explained the methodology to reliably determine pre-death dosage levels, which three recent peer-reviewed articles suggest does not currently exist.  The government's response also did not explain how their experts could have accounted for substances not prescribed, or substances not taken as prescribed prior to the patient's death.

The recent, peer-reviewed literature thus makes clear that post-mortem toxicology findings are not reliable, and therefore these findings should have been excluded under Fed. R. Evid. 702.

### 3.     Other Unreliable Procedures and Results

The autopsy findings with respect to several patients yielded results that were scientifically impossible, and this too should have led to the exclusion of expert testimony with respect to, at the very least, these specific patients.

With respect to patient Randall S, Oxazapam was found in the heart blood, but not the femoral blood. Aplee. Supp. App. 406, 407.  With respect to patient Kandace B, Oxycodone was found (although not quantified) in the urine but not in the blood.  *Id.* at 378, 380.  With respect to patient Eric T, the hospital did not detect any Oxycodone in the blood, but the laboratory did.  *Id.* at 397, 398.  These findings are scientifically impossible. Furthermore, with respect to patient Toni W, the laboratory measured only heart blood, but not femoral blood.  *Id.* at 388, 389.  The laboratory also did not use the available urine to confirm the findings in the heart blood.  This

failure casts serious doubt on the reliability of the laboratory's findings, and such findings should therefore have been excluded.[18]

Furthermore, the laboratory failed to conduct histological examinations (microscopic analysis of preserved tissue) of patient hearts in a large number of cases. Aplee. Supp. App. 262-63. As discussed above, such examinations are particularly important because they are necessary to rule out heart disease as a cause of death. Put another way, a differential diagnosis cannot adequately and reliably conclude that death was caused by a drug overdose where there is a failure to even check for, let alone rule out, a more common and more likely cause. Therefore, given that the laboratory failed to follow basic procedures with respect to a number of patients, the government's proposed expert testimony pertaining to those patients should have been excluded.

Finally, in a number of cases, the laboratory failed to conduct other vital procedures during the autopsy. For example, in the case of Michael F, the entire autopsy consisted of an external exam. Aplee. Supp. App. 408-12. These cases show a fundamental lack of scientific rigor and hence,

---

[18] In its response, the government stated that with respect to Randall S, the femoral blood was not tested because there were only trace amounts of the drug in the heart. The government did not address any of the other points, stating that its experts would explain that the laboratory results are "not impossible." Aplee. Supp. App. 98.

reliability, and provide further reasons for the exclusion of the evidence

under Fed. R. Evid. 702.

> **4.    The Lack of Reliable Methodology with Respect to Conclusions Based on Patient Behaviors and Prescribing Practices**

The government's experts conclude that Dr. Schneider acted outside

the course of medical practice, and they purport to base these conclusions

largely on two grounds.[19] First, they base their conclusions on the so-called

"red flags," or aberrant drug-related behaviors of patients.  Aplee. Supp.

App. 321, 323, 324, 326, 343, 349.  Second, they base their opinions on

other factors relating to Dr. Schneider's prescribing practices. *See, e.g.*, *id.* at

322, 324, 344-55.  The defendants objected to the use of these grounds for

the purposes of reaching the conclusions the government's expert intend to

provide because there is no reliable methodology to "apply" these factors to

reach the conclusions proposed by the government's experts.  *Id.* at 63-69.

---

[19] This issue is a threshold issue with respect to Dr. Schneider's culpability for patient deaths, because if he did not act outside the course of practice, he may not be held culpable for those deaths.

"Red flags," or aberrant drug-related behaviors (ADRBs) are warnings that addiction or abuse of controlled substances *might* occur.[20] Aplee. Supp. App. 58-61. Red flags may also reflect legitimate drug-seeking behavior for undertreated pain, Lynn R. Webster & Rebecca M. Webster, *Predicting Aberrant Behaviors in Opioid-Treated Patients: Preliminary Validation of the Opioid Risk Tool*, 6 Pain Med 432, 433, 439 (2005) (Aplee. Supp. App. 202, 203, 209), and experienced physicians do not view the red flag behaviors uniformly as indicative of abuse. Steven D. Passik, et al., *Pain Clinicians' Rankings of Aberrant Drug-Taking Behavior*, 16 J. Pain & Palliative Care Pharmacotherapy 39 (2002) (Aplee. Supp. App. 187). The current literature indicates that while there are attempts to study red flags, and to develop risk-assessment tools for opioid prescribing in a clinical setting, there is currently no method by which to determine when to cease prescribing to a patient. *See*, *e.g.*, Passik and Webster articles, *supra*.

---

[20] These concepts are distinct from "risk factors," which are patient attributes (such as prior personal substance abuse, family history of substance abuse, etc.) that may be used to assess a patient's risk of engaging in aberrant behaviors, which in turn *may or may not* be reflective of abuse or addiction. L. R. Webster, *Predicting aberrant behaviors in opioid-treated patients. Preliminary validation of the opioid risk tool*, 6 Pain Med 432 (2005). Thus, while literature suggests that certain risk factors may be predictive of aberrant behavior, the link between risk facts or and aberrant behavior on one hand, and abuse and addiction on the other, is tenuous and unreliable.

Despite these limitations on the predictive value of the red flags, the government's experts purport to reliably conclude that Dr. Schneider "ignored" the red flags, that he should have stopped prescribing or altered his practices,[21] and that by failing to do so he acted "outside the course of professional practice". Aplee. Supp. App. 322, 327, 350, 351. Fed. R. Evid. 702 requires that experts' opinions must be based on "sufficient facts or data" and "reliable principles and methods." *Daubert* requires that expert testimony must be must be proved preliminarily to be "more than subjective belief," 509 U.S. at 589, and to have been "derived by the scientific method," 509 U.S. at 590. Given that the current literature reflects that the red flags have limited predictive value of addiction and abuse, it is unclear how an expert could validly use red flags to retrospectively conclude that a prescription was written "outside the course of medical practice." If such a method exists, the government has not put it forward, let alone shown it to

---

[21] Indeed, a leading researcher explained that the red flags do not require a physician to stop prescribing to a patient. Steven D. Passik, *Pain Management Misstatements: Ceiling Effects, Red and Yellow Flags*, 7(1) Pain Medicine 76 (2006) (Aplee. Supp. App. 199-200).

be reliable.[22] This evidence, therefore, is no more reliable than the spectral

evidence used to convict the witches of Salem and ought not be admitted.

While the government claims that the red flags were only one basis for

its experts' opinions, the underlying lack of reliability and methodology is

not cured by the government's reliance on other factors regarding Dr.

Schneider's prescribing practices.  The government's disclosures list a

number of treatment decisions as bases for the conclusion that Dr. Schneider

did not prescribe controlled substances for a legitimate medical purpose,

including escalation of doses, prescribing of multiple controlled substances

to a patient, involving patients in prescribing decisions, and treatment of so-

called "addicts." *See generally* Aplee. Supp. App. 318-28, 339-55.  Not

surprisingly, these practices actually reflect the standard of care in pain

---

[22] While courts have held that the gatekeeping function requires evaluation
of experts' methods and bases, rather than their conclusions, *see*, *e.g.*, *Bitler
v. A.O. Smith Corp.*, 400 F.3d 1227, 1233 (10th Cir. 2004), it is necessary to
ensure that the bases and methods are reliable for the purpose for which they
are purportedly used.  The district court, relying on the general proposition
that courts are to focus on methods and bases, rather than conclusions,
ignored the fact the defendants' argument that the purported conclusion
could not reliable stem from the bases and methods used by the
government's experts. Aplee. Supp. App. 148.  The district court treated the
opinions of the defendants' expert and that of the government as simply
"competing opinions," relying on the same methods.  *Id.* at 148-49.

treatment,[23] and it is therefore not clear by what method the government's experts have, or even *could*, distinguish quality medical pain management from the legal equivalent of drug dealing.

The Supreme Court's decision in *Kumho Tire* makes it plain that an expert's testimony cannot be based on his purely subjective opinions, but rather must set forth a methodology that a jury can follow. The type of subjective testimony offered by the government here woefully fails to meet these standards because the government has not come forward with any methodology at all.

To be clear, we do not assert that the red flags are not relevant for any purpose, and that the government's witnesses cannot discuss the red flags at all. Provided that the issues are fully developed, and the district court finds some relevance outweighing prejudice and confusion, the government's

---

[23] Escalation of dosages ("titration") is the standard of care in modern pain treatment, and there are legitimate medical reasons for prescribing multiple oioids to one patient. Perry G. Fine & Russel K. Portenoy, *A Clinical Guide to Opioid Analgesia*, (2004) *available at* http://www.stoppain.org/pcd/content/forpros/opioidbook.asp (Aplee. Supp. App. 62, 165). Furthermore, it may be proper to prescribe controlled substances even to a patient who is addicted. Stuart A. Dunbar & Nathaniel P. Katz, *Chronic Opioid Therapy for Non-Malignant Pain in Patients with a History of Substance Abuse: Report of 20 Cases*, 11 J. Pain & Symptom Mgmt. 163 (1996) (Aplee. Supp. App. 214-22); Charles Chabal, et al., *Prescription Opiate Abuse in Chronic Pain Patients: Clinical Criteria, Incidence, and Predictors*, 13 Clin. J. Pain 150 (1997) (Aplee. Supp. App. 224-229).

experts may testify that they disagree with Dr. Schneider's decision-making in light of certain patient behaviors.  However, the experts should not be allowed to mischaracterize ambiguous patient behaviors as reliable for the purpose of reaching their purported conclusions.  *See*, *e.g.*, *United States v. Leon*, 966 F.2d 1455 (6th Cir. 1992) ("In the context of a criminal trial there is a strong countervailing restraint stemming from a defendant's right to a fair trial, cautioning that [b]ecause of its apparent objectivity, an opinion that claims a scientific basis is apt to carry undue weight with the trier of fact." (quoting *United States v. Brown*, 557 F.2d 541, 556 (6th Cir. 1977)).

Under Fed. R. Evid. 702, the red flags and other factors should not be presented as definitive guidelines for medical decision-making.  Such testimony is inconsistent with medical science, and creates a substantial risk that it will mislead the jury.  Accordingly, it should have been excluded under Fed. R. Evid. 702.

## CONCLUSION

For all of the reasons stated above, this Court should reverse the decision of the district court, and exclude all of the government's proposed evidence with respect to patients' cause of death.  Alternatively, this Court should remand with instructions to hold a *Daubert* hearing or otherwise

require the government to meet its evidentiary burden.  On the government's

appeal, this Court should affirm.

Appellees' request oral argument.

Respectfully submitted,

s/ Eugene V. Gorokhov
Eugene V. Gorokhov
Eugene V. Gorokhov, PLLC
1800 Wilson Boulevard, Suite 12
Arlington, VA 22201
(703) 310-7587
Eugene@evgpllc.com
*Counsel for Linda K. Schneider*

Kevin P. Byers
Kevin P. Byers Complany, L.P.A.
107 South High Street, Suite 400
Columbus, OH 43215
(614) 228-6283
kevin@kpbyerslaw.com
*Counsel for Linda K. Schneider*

Lawrence W. Williamson, Jr.
Williamson Law Firm, PLLC
816 Ann Avenue
Kansas City, MO 66101
(913) 871-7060
l.Williamson@williamsonfirm.com
*Counsel for Stephen J.  Schneider*

# CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

        [ X ] this brief contains *13,138* words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

        [    ] this brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

        [ X ] this brief has been prepared in a proportionally spaced typeface using *Microsoft Word 2000* in *14pt Times New Roman*; *or*

        [    ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

Dated: <u>March 30, 2009</u>                    s/ Eugene V. Gorokhov
                                                Eugene V. Gorokhov
                                                Eugene V. Gorokhov, PLLC
                                                1800 Wilson Boulevard, Suite 12
                                                Arlington, VA 22201
                                                (703) 310-7587
                                                Eugene@evgpllc.com

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing BRIEF OF

APPELLEES'/CROSS-APPELLANTS' was served on the 30th day of March,

2009, in digital format via e-mail addressed to the following:

Marietta Parker                          Tanya J. Treadway
Office of the U.S. Attorney              Office of the U.S. Attorney
500 State Avenue, Suite 360              444 South East Quincy, Room 290
Kansas City, KS 66101                    Topeka, KS 66683
(913) 551-6730                           (785) 295-2850
marietta.parker@usdoj.gov                tanya.treadway@usdoj.gov

Richard A. Friedman
U.S. Department of Justice
950 Pennsylvania Avenue, NW, Room 1264
Washington, DC 20530
(202) 514-3965
Richard.Friedman@usdoj.gov

This brief was made into PDF format.  Further, any required privacy

redactions have been made and every document submitted in digital format is an

exact copy of the written document filed with the Clerk.  The digital submissions

have been scanned for viruses with Norton Antivirus and, according to the

program, are free of viruses.

<u>s/ Eugene V. Gorokhov</u>
Eugene V. Gorokhov
Eugene V. Gorokhov, PLLC
1800 Wilson Boulevard, Suite 12
Arlington, VA 22201
(703) 310-7587
Eugene@evgpllc.com